UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

SANDRA J. REYNOLDS,            )
                               )
            Plaintiff          )
                               )
            v.                 )   Case No. 2:03 cv 454
                               )
NISOURCE, INC. and NISOURCE    )
CORPORATE SERVICES, INC.,      )
                               )
            Defendants         )

OPINION AND ORDER

This matter is before the court on the Motion for Summary Judgment filed by the defendants, NiSource, Inc. and NiSource Corporate Services, Co., on February 28, 2005.  For the reasons set forth below, the motion is GRANTED.

Background

The plaintiff, Sandra Reynolds, held a variety of secretarial positions with Northern Indiana Public Service Company (NIPSCO), a company under the NiSource, Inc. umbrella, since 1981.  In 1998, Reynolds began working with Brian Skinner, a generating plant manager, on a four or five week project. (Reynolds Dep. pp. 54, 24) Around this time, Skinner began calling Reynolds at home, telling her that he loved her, suggesting that they leave their spouses for each other, driving past her house, leaving notes for her, and waiting for her at the elevator.  (Reynolds Dep. pp. 37, 43, 48, 52) Because of Skinner's actions, Reynolds states that she began having anxiety attacks which led her to take an eight week sick leave in early spring of 1999.  (Reynolds Dep. pp. 52-53) Although she reported

Skinner to her supervisor at the time, James Goodwin, Skinner still was employed by NIPSCO when Reynolds returned from her sick leave, and Reynolds states that she did not inquire about the situation further. (Reynolds Dep. p. 65) A subsequent review by NiSource showed that Reynolds chose not to make a formal complaint against Skinner. (MSJ Exh. B, p. 12)

After Reynolds returned, she heard from a coworker that Skinner continued to ask about her. She also testified that on one occasion, Skinner stared at her for five minutes while she was talking to an ATM repairman. (Reynolds Dep. p. 125) In 2000, Skinner invited Reynolds to a holiday party. In May 2002, Reynolds began working out at the SouthLake Fitness Center where she would see Skinner looking in at her. The last time Reynolds spoke with Skinner was July 10, 2002. (Reynolds Dep. pp. 127, 148)

In July 2000, Reynolds divorced her husband, Robert Reynolds, an officer with the Police Department in Highland, Indiana. (Reynolds Dep. p. 9) Officer Reynolds had been physically and verbally abusive to Reynolds since their marriage in 1994. (Reynolds Dep. pp. 56-59) In July 2002, Officer Reynolds alleged that he had been shot by an unknown assailant, but upon investigation, the police determined that Officer Reynolds shot himself because he wanted Reynolds back in his life. On August 27, 2002, Officer Reynolds gained access to a police computer while he was on leave, input the license plate number of a car that was in

Reynolds' driveway, and obtained the address of Kenneth Prieboy, a NIPSCO employee with whom Reynolds was involved.[1]

Around September 9, 2002, Reynolds received a letter at work from a "former friend" of Prieboy in which the author warned Reynolds that Prieboy had herpes.  (Reynolds Dep. p. 229 & Exh. 1 thereto; MSJ Exh. B, p. 3) On September 12, 2002, Prieboy received a letter at his home warning him to stop seeing Reynolds or he would lose his job.  This letter stated that the author would be at the Purdue Dinner which many NIPSCO employees were attending on September 19, 2002.  (Reynolds Dep. p. 236) In addition, Prieboy received a strange email to his work account from the address "CaspianP14@aol.com" on September 17, 2002. (MSJ Exh. H)

Also on September 17, NiSource Chairman Gary Neale received a letter at work from "A Concerned Employee" stating that Reynolds and Prieboy were engaging in sexual behavior at work.  (MSJ Exh. G) Consequently, Manager of Corporate Compliance Frank Taber and his supervisor, Vice President of Auditing Arthur Paquin, began an ethics investigation that day.  (Paquin Dep. p. 69, Exh. B, p. 3)

At some point between September 12 and 18, 2002, Reynolds and Prieboy contacted Charles Lambert, who worked in security at

---

[1] These facts are derived from the defendants' Memorandum in Support of Summary Judgment.  (MSJ, p. 3) Although the defendants' exhibits do not include the deposition testimony upon which they rely to describe Officer Reynolds' actions, the plaintiff does not dispute that these events occurred. Accordingly, the court takes these facts as true for purposes of the defendants' motion.

the SouthLake Complex, regarding the letters they had received.
According to Lambert, Skinner was the only person Reynolds
suggested had authored the letters.  (Lambert Dep. p. 45) Because
Lambert no longer was involved in handling this type of situa-
tion, Lambert directed Reynolds and Prieboy to Paquin and Taber.
(Reynold Dep. p. 242) On September 18, 2002, Lambert contacted
Taber regarding the letter received by Reynolds.  (MSJ Exh. B, p.
3)

On September 19, 2002, the day of the Purdue Dinner, Lambert
gave the first letter sent to Reynolds, the email Prieboy re-
ceived, and photos of employees at the SouthLake Complex who knew
of Reynolds and Prieboy's relationship, to Taber.  The same day,
Reynolds asked Taber whether she was under investigation for
something, informed him that her ex-husband had shot himself, and
said that she was in a relationship with Prieboy.  Prieboy gave
Taber his letter at the Purdue Dinner.  That evening, Reynolds
received numerous harassing phone calls at her home where Prieboy
spent the night.  (MSJ Exh. B, p. 3; Rick Bonesteel Dep. pp. 17-
18) The Highland Police Department later determined that these
phone calls came from Officer Reynolds' phone.  (Bonesteel Dep.
p. 18)

According to Taber, on September 20, 2002, Reynolds told
Taber that Skinner had sexually harassed her two years previously
and that her former supervisor, James Goodwin, had required her
to pay him $120 in cash because he claimed she had mishandled a
reservation for him.  (MSJ Exh. B, p. 3) According to Reynolds,

4

she requested a meeting with Taber to discuss the letters she and Prieboy had received, at which point she told Taber that Skinner had been stalking her and that he was her only suspect. (Reynolds Dep. p. 246)

After speaking with Taber, Reynolds received two additional letters. The second letter threatened her job if she did not stop seeing Prieboy and stated that the author was aware Reynolds had turned another letter over to Lambert that the author had not written. The author also stated that Prieboy had been observed with Reynolds the previous Thursday and had spent the night at her house. (Exh. 2 to Reynolds Dep.) Reynolds gave this letter to Taber and Paquin. (Reynolds Dep. p. 249) The third letter, which Reynolds received at home on September 22, 2002, said that it was her "last warning" to stop seeing Prieboy and that the author would "go after" Reynolds' daughter if she did not end the relationship. (Exh. 4 to Reynold's Dep.) That evening, Reynolds contacted the Highland police. (Reynolds Dep. p. 254)

At some point during these events, Vice President of Human Resources Gail Harowski met with Reynolds because Reynolds' immediate supervisor, Randy Polster, was concerned that Reynolds appeared distracted and was absent from her desk. (Reynolds Dep. pp. 127-30; Gail Harowski Dep. pp. 34-45) According to Harowski, she told Reynolds that it was in her "best interests to be careful" and not talk to many people about the situation. (Harowski Dep. p. 45) According to Reynolds, Harowski told her to "act very saintly" at work, to act like a nun, not talk to men or

5

be seen shaking hands with men, and that it was in her "best interest to stop working out at the fitness center." (Reynolds Dep. p. 129)

On September 23, 2002, Highland Police Chief Pete Hojnicki directed Taber to return the letters he had collected from Reynolds to her so that she could turn them over to the police, which Taber did that day. (MSJ Exh. B, p. 4) Also on September 23, Reynolds met with Paquin and Chairman Neale's assistant, Kathy Mole, at which point Reynolds gave Paquin a copy of the third letter she received. According to Reynolds, Paquin asked whether Reynolds had received her $120 from Goodwin and directed her to speak with the Police Department for Merrillville, Indiana. (Reynolds Dep. pp. 257-59) After this meeting, Reynolds went on sick leave for anxiety until November 12. (Reynolds Dep. p. 263)

On September 24, 2002, Paquin and Taber met with Gary Kruse, NiSource's local ethics advisor and company attorney, at which time Kruse recommended looking into Reynolds' previous complaints about Skinner and Goodwin. (MSJ Exh. B, pp. 4-5; Paquin Dep. p. 71) The evidence shows that NiSource had transferred Reynolds to a position with a different supervisor as a result of the Goodwin situation and that she did not file a formal complaint against Skinner. (MSJ Exh. B, pp. 4-5, 12)

On September 25, 2002, Prieboy contacted Taber regarding a second letter he received at home the previous day. (MSJ Exhs. B, p. 4, H) This letter threatened Prieboy's job and stated that

6

the author could access emails sent between Prieboy and Reynolds. (MSJ Exh. H) Chairman Neale also received a second letter from "A Concerned Employee" on September 27 stating that Reynolds and Prieboy had been observed having sex in the SouthLake Complex. (MSJ Exh. G) Finally, at some point Reynolds received a final letter from "K.G.," which she did not bring to the defendants' attention until this lawsuit.  This letter, which was sexually graphic about Reynolds, also stated that Prieboy was involved with another woman.  The letter further stated that the author had gotten Reynolds' home address from work.  (Reynolds Dep. p. 291 & Exh. 5 thereto)

From September 25 to October 31, 2002, Taber obtained lists of invitees and attendees of the Purdue Dinner held on September 19, determined that the "Caspian14" email address was registered to a second lieutenant at Ft. Bragg, and put the Highland Police in contact with a NiSource computer technician who could help the police on the technical aspects of the case.  He further requested all emails from Reynolds' and Prieboy's mailboxes from "Caspian14," reviewed a list of invitees to a pool party held by Reynolds in July, and worked with the Merrillville Police Department to plan polygraphs of three employees, including Skinner. In addition, Paquin requested that a psychologist review the letters through the Highland Police Department.  Meanwhile, the police informed Taber that the letters had been given to the State Police crime lab for DNA and fingerprint evidence.  (MSJ Exh. B, pp. 5-8)

On October 30, 2002, Skinner contacted Detective Rick
Bonesteel of the Merrillville Police Department seeking informa-
tion regarding the polygraph test.  (Bonesteel Dep. p. 31)
Similarly, Skinner asked Taber about the polygraph and the facts
surrounding the request on October 31.  According to Taber,
Skinner became agitated that Taber would not provide information
and left angrily.  (MSJ Exh. B, p. 8) On November 10, 2002,
Skinner was laid off by NiSource as part of a reduction in force.
(MSJ Exh. B, p. 8; Paquin Dep. p. 80)

At the time of the polygraph tests on November 26, 2002, the
Merrillville Police Department's primary suspect in the letter-
writing was Officer Reynolds.  (Bonesteel Dep. pp. 26, 30) When
Skinner appeared for his polygraph, he brought an attorney and
was totally uncooperative, so the test never was administered.
(Bonesteel Dep. pp. 37-40) As a result of Skinner's behavior,
Bonesteel refocused his investigation on both Skinner and Rey-
nolds.  (Bonesteel Dep. p. 40) However, when Taber contacted the
Highland Police Department, Detective David Calarie informed him
that Officer Reynolds still was the primary suspect.  (MSJ Exh.
B, p. 8)

The timing of the next events is not altogether clear.
According to Reynolds, she contacted Taber between December 5 and
11, 2002, to ask that Skinner be banned from the building at
SouthLake.  (Reynolds Dep. pp. 296-97, 303) Reynolds states that
Taber discussed this option with Paquin who decided to allow
Skinner in the building with an employee escort but declined to

8

ban him.  (Reynolds Dep. pp. 298-303) Consequently, Reynolds states that she went to Director of Corporate Security David Quilter and Quilter's staff, Louis Ortiz and Lambert, as well as Polster and Director of Claims Tim Bucci with her request. (Reynolds Dep. pp. 299-304) Similarly, Taber states that he and Paquin determined that Skinner still could enter the building escorted on December 11, 2002, even though Bonesteel informed Taber that Skinner now was the primary suspect in the letter-writing because of his behavior during the attempted polygraph test.  (MSJ Exh. B, p. 9; Lambert Dep. p. 50) Taber further stated that the actual decision to ban Skinner did not occur until December 19, 2002, when Bucci informed Taber that Reynolds had requested the ban in a conversation with him on December 18. (MSJ Exh. B, p. 9)

Conversely, Paquin testified that the security guards had been "on alert" for Skinner since his name was introduced and that he "reiterated" the decision not to allow Skinner on company property after the polygraph test.  (Arthur Paquin Dep. p. 98) He also stated that he had directed Kruse and Taber to reassure Reynolds that Skinner would not be in the building.  This directive resulted in a meeting on December 19, 2002.  (Paquin Dep. p. 103)

On December 19, Polster, Taber, and Kruse invited Reynolds into a meeting regarding the investigation.  (Reynolds Dep. p. 309; MSJ Exh. B, p. 9) According to Reynolds, Kruse stated that NiSource believed Reynolds had authored the letters in an attempt

9

to get Skinner fired.  In addition, she stated that Polster
confirmed that Paquin told Harowski to have the meeting with
Reynolds in which Harowski told her to change her appearance and
actions.  (Reynolds Dep. pp. 311-12) Following this meeting,
Reynolds took a disability leave and has not returned to work.
(Reynolds Dep. p. 315)

On December 30, 2002, Taber and Quilter met with Bonesteel
and Whited of the Indiana State Police for an update on the
investigation.  (MSJ Exh. B, p. 12) The detectives reiterated
their position that Skinner was the primary suspect in the
letter-writing and asked to be informed if a forensic investiga-
tion of Skinner's computer, which Taber began on December 11,
resulted in any evidence.  (MSJ Exh. B, pp. 9, 11) On January 9,
2003, Taber learned that the forensic review had not recovered
any evidence beyond some friendly emails between Reynolds and
Skinner in July 2001.  (MSJ Exh. B, p. 11) On April 5, 2004,
Bonesteel received the results of the fingerprint testing done by
the State Police and learned that Officer Reynolds' prints were
found on one letter sent to Prieboy.  (Bonesteel Dep. p. 47)
Because Prieboy did not want to pursue charges against Officer
Reynolds, the police closed their case.  (Bonesteel Dep. pp. 57-
59) Reynolds also did not receive any more letters.  (Paquin Dep.
p. 123)

When an employee brings a harassment claim against a spe-
cific coworker, NiSource separates the employees and then either
fires or places the harasser on leave if it is determined that

the person in fact was acting inappropriately.  (Paquin Dep. p. 107) During the pendency of an investigation of a known harasser, security is notified and measures are taken to protect the victim.  (Paquin Dep. p. 107; Lambert Dep. p. 56) NiSource provides an escort in and out of the building if a victim requests it, makes local supervision aware of the complaint, and alters the victim's working hours or gives the victim a closer parking spot.  (Paquin Dep. pp. 109-10) According to Lambert, security was notified at some point following the polygraphs at the end of November 2002.  (Lambert Dep. pp. 57-60) With respect to the additional forms of protection, Reynolds testified that Bucci informed her of these options when they spoke in December 2002.  (Reynolds Dep. p. 308) However, Paquin stated that Reynolds did not ask for them.  (Paquin Dep. pp. 112-13)

On January 15, 2004, Reynolds filed suit against NiSource, Inc. and NiSource Corporate Services, Co., alleging that she was the victim of harassment and sex discrimination under these facts.

Discussion

Pursuant to Federal Rule of Civil Procedure 56(c), summary judgment is proper only if it is demonstrated that "there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law." See Celotex Corp. v. Catrett, 477 U.S. 317, 322-23, 91 L.Ed.2d 265, 106 S.Ct. 2548 (1986); Lawrence v. Kenosha County, 391 F.3d 837, 841 (7th Cir. 2004); Branham v. Snow, 392 F.3d 896, 901 (7th Cir. 2004); Windle

11

v. City of Marion, Indiana, 321 F.3d 658, 660-61 (7th Cir. 2003),
cert. denied, 540 U.S. 873, 124 S.Ct. 873, 157 L.Ed.2d 133
(2003).  The burden is upon the moving party to establish that no
material facts are in genuine dispute, and any doubt as to the
existence of a genuine issue must be resolved against the moving
party.  Adickes v. S.H. Kress & Company, 398 U.S. 144, 160, 90
S.Ct. 1598, 1610, 26 L.Ed.2d 142, 155 (1970); Lawrence, 391 F.3d
at 841. A fact is material if it is outcome determinative under
applicable law.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242,
248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202, 212 (1986); Lawrence,
391 F.3d at 841; Hottenroth v. Village of Slinger, 388 F.3d 1015,
1027 (7th Cir. 2004); Palmer v. Marion County, 327 F.3d 588, 592
(7th Cir. 2003).  Even if the facts are not in dispute, summary
judgment is inappropriate when the information before the court
reveals a good faith dispute as to inferences to be drawn from
those facts.  Spiegula v. Hull, 371 F.3d 928, 935 (7th Cir.
2004); Hines v. British Steel Corporation, 907 F.2d 726, 728 (7th
Cir. 1990).  Finally, summary judgment "will not be defeated
simply because motive or intent are involved."  Roger v. Yellow
Freight Systems, Inc., 21 F.3d 146, 148 (7th Cir. 1994).  See
also Miller v. Borden, Inc., 168 F.3d 308, 312 (7th Cir. 1999);
Plair v. E.J. Brach & Sons, Inc., 105 F.3d 343, 346 (7th Cir.
1997); United Association of Black Landscapers v. City of Milwau-
kee, 916 F.2d 1261, 1268 (7th Cir. 1990).

In deciding a motion for summary judgment, the trial court
must determine whether the evidence presented by the party

opposed to the summary judgment is such that a reasonable jury might find in favor of that party after a trial.

> The inquiry performed is the threshold inquiry of determining whether there is the need for a trial--whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.
>
> [T]his standard mirrors the standard for a directed verdict under Federal Rule of Civil Procedure 50(a), which is that the trial judge must direct a verdict if, under the governing law, there can be but one reasonable conclusion as to the verdict.
>
> Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202, 212 (1986)

See also, Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 149-151, 120 S.Ct. 2097, 2109, 147 L.Ed.2d 105, 120-22 (2000) (setting out the standard for a directed verdict); Celotex Corp., 477 U.S. at 322-323, 106 S.Ct. at 2553; Branham, 392 F.3d at 901; Lawrence, 391 F.3d at 841; Hottenroth, 388 F.3d at 1027 (stating that a genuine issue is one on which "a reasonable fact finder could find for the nonmoving party"); Schuster v. Lucent Technologies, Inc., 327 F.3d 569, 573 (7th Cir. 2003) (stating that a genuine issue exists and summary judgment is inappropriate if there is sufficient evidence for a jury to return a verdict for the nonmoving party).

As a preliminary matter, the court finds that summary judgment is appropriate with respect to defendant NiSource, Inc. The defendants argue that NiSource is not a proper defendant

under Title VII because it is a publicly-held holding company with no employees.  See 42 U.S.C. §200e(b); Cooper v. Southern Company, 260 F.Supp.2d 1305, 1309 n.1 (N.D. Ga. 2003), aff'd 390 F.3d 695 (11th Cir. 2004).  Reynolds concedes this point by failing to respond.  See Rule 56(e).  See also Johnson v. Gud-mundsson, 35 F.3d 1104, 1112 (7th Cir. 1994).  Accordingly, summary judgment is granted in favor of NiSource, Inc. on all claims.

Additionally, summary judgment must be granted in favor of the remaining defendant, NiSource Corporate Services, on Rey-nolds' claim for disability discrimination under the Americans with Disabilities Act.  See 42 U.S.C. §12101 et. seq.  Reynolds asserts an ADA claim for the first time in her summary judgment response brief.  The amended complaint contained no allegations of disability discrimination nor statements from which an ADA claim could be inferred.  In addition, Reynolds has characterized her suit exclusively as a Title VII action throughout the pen-dency of this litigation.  (See, e.g., Plaintiff's Motion for Protective Order, p. 1) Reynolds may not now amend her pleadings "through arguments in her brief in opposition to a motion for summary judgment."  Whitaker v. T.J. Snow Company, 151 F.3d 661, 664 (7th Cir. 1998) (alterations omitted); Shanahan v. City of Chicago, 82 F.3d 776, 781 (7th Cir. 1996).  Therefore, summary judgment is granted with respect to Reynolds' attempted ADA claim, leaving only her sexual harassment and sex discrimination claims against NiSource Corporate Services.

Title VII provides that it is unlawful to "fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex." 42 U.S.C. §2000e-2(a)(1). See also Meritor Savings Bank, FSB v. Vinson, 477 U.S. 57, 63, 106 S.Ct. 2399, 2404, 91 L.Ed.2d 49 (1986). Included in this "spectrum" is a prohibition against "requiring people to work in a discriminatorily hostile or abusive environment." Harris v. Forklift Systems, Inc., 510 U.S. 17, 21, 114 S.Ct. 367, 370, 126 L.Ed.2d 295 (1993). Thus, "[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment, Title VII is violated." Harris, 510 U.S. at 21, 114 S.Ct. at 370 (quotation marks and citations omitted).

In order for Reynolds to establish that she was subjected to a hostile work environment, she must show that

> (1) she was subjected to unwelcome sexual advances in the form of requests for sexual favors or other verbal or physical conduct of a sexual nature; (2) the harassment was based on [her] sex; (3) the sexual harassment had the effect of unreasonably interfering with [her] work performance in creating an intimidating, hostile, or offensive working environment that affected seriously the psychological well being of the plaintiff; and (4) there is a basis for employer liability.
>
> Romansizak-Sanchez v. International Union of Operating Engineers, Local 150, AFL-CIO, 121 Fed. Appx. 140, 144-45 (7th Cir. 2005) (quot-

15

                ing Hall v. Bodine Electric Company, 276 F.3d
                345, 354-55 (7th Cir. 2002)

See also Rhodes v. Illinois Department of Transportation, 359
F.3d 498, 505 (7th Cir. 2004).  A work environment must be both
subjectively and objectively offensive in order to be hostile.
Rhodes, 359 F.3d at 505 (quoting Hilt-Dyson v. City of Chicago,
282 F.3d 456, 463 (7th Cir. 2002)).  Whether an environment is
objectively hostile depends on "all of the circumstances, includ-
ing the frequency and severity of conduct, whether it is threat-
ening or humiliating, or a mere offensive utterance, and whether
it unreasonably interfered with an employee's work performance."
Romansizak-Sanchez, 121 Fed. Appx. at 145 (quoting Smith v.
Northeastern Illinois University, 388 F.3d 559, 566 (7th Cir.
2004)).  See also Wyinger v. New Venture Gear, Inc., 361 F.3d
965, 975-76 (7th Cir. 2004).

    In determining whether harassment is "based on sex" in the
context of a hostile environment claim, "[t]he critical issue
. . . is whether members of one sex are exposed to disadvanta-
geous terms or conditions of employment to which members of the
other sex are not exposed."  Oncale v. Sundowner Offshore Ser-
vices, 523 U.S. 75, 80, 118 S.Ct. 998, 1002, 140 L.Ed.2d 201
(1998).  See also Hilt-Dyson, 282 F.3d at 462-63.  In other
words, "an employer cannot be held liable for creating or condon-
ing a hostile working environment unless the hostility is moti-
vated by gender."  Berry v. Delta Airlines, Inc., 260 F.3d 803,
808 (7th Cir. 2001).  See also Oncale, 523 U.S. at 80, 118 S.Ct.

16

at 1002 (Ginsburg, J. concurring) (noting that although harass-
ment "need not be motivated by sexual desire," it must be "clear
that the harasser is motivated by general hostility to the
presence of" a particular gender).

Thus, the simple fact that the victim is female does not
satisfy the requirement that the harassment she experienced was
based on her sex.  See Herron v. Daimlerchrysler Corporation, 388
F.3d 293, 303 (7th Cir. 2004) (finding that the plaintiff's
membership in a protected class "does not transform" harassment
related to him into harassment related to his race).  In particu-
lar, harassment based on the fact that the victim had jilted the
harasser romantically does not fall under the purview of Title
VII protection.  See Huebschen v. Department of Health and Social
Services, 716 F.2d 1167, 1172 (7th Cir. 1983).  See also Shafer
v. Kal Kan Foods, Inc., 417 F.3d 663, 666 (7th Cir. 2005).

In addition to establishing that the harassment is based on
sex, Reynolds must establish employer liability.  See Romansizak-
Sanchez, 121 Fed. Appx. at 144-45.  If the harasser is a supervi-
sor, the employer is strictly liable with the possibility of an
affirmative defense.  See Rhodes, 359 F.3d at 505.  If the
harasser is not a supervisor, then Reynolds must show that her
employer was negligent in failing to discover or remedy any
harassment.  Loughman v. Malnati Organization, Inc., 395 F.3d
404, 407 (7th Cir. 2005); Rhodes, 359 F.3d at 505.

Under the negligence standard for coworker harassment, the
court must look at the employer's total response to the alleged

17

harassment.  McKenzie v. Illinois Department of Transportation,
92 F.3d 473, 480 (7th Cir. 1996).  An employer only is liable "if
the employer knew or should have known about the coworker's acts
of harassment and fails to take appropriate remedial action."
Berry, 260 F.3d at 811 (alteration, citation, and quotations
omitted).  See also Cardenas v. Frito-Lay, Inc., No. 01-C-647-C,
2002 WL 32357082, at *5 (W.D. Wis. Sept. 30, 2002).  Remedial
action is appropriate if it is prompt and reasonably calculated
to end the harassment under the particular circumstances of the
case, although the employer's liability does not hinge on the
actual cessation of harassment.  See Berry, 260 F.3d at 811;
McKenzie, 92 F.3d at 480; Saxton v. American Telephone and
Telegraph Company, 10 F.3d 526, 536 (7th Cir. 1993).  In addi-
tion, the victim's expectations of behavior by her employer have
no bearing on the negligence analysis.  See Cardenas, 2002 WL
32357082, at *7 ("Plaintiff might disagree with how certain
aspects of the investigation and response were handled, but . . .
this is legally irrelevant."); Motley v. Tractor Supply Company,
32 F.Supp.2d 1026, 1050-51 (S.D. Ind. 1998) ("Just because an
employee expected more from the employer, or a different re-
sponse, does not mean that the employer failed to take appropri-
ate remedial action, once it was on notice of the problem.").
See also Saxton, 10 F.3d at 526.

When the harasser is anonymous, an employer's prompt inter-
nal investigation, which can include notification and cooperation
with the police, may be considered reasonable.  See Hirras v.

National Railroad Passenger Corporation, 95 F.3d 396, 398-400
(5th Cir. 1996); Cardenas, 2002 WL 32357082, at *4-7.  For exam-
ple, in Cardenas, the plaintiff truck driver heard two coworkers
talking about him in racially derogatory terms over the radio.
After the employer's investigation into the matter did not reveal
any conclusive evidence beyond a "swearing contest" between the
plaintiff and his coworkers, the plaintiff received an anonymous
racially derogatory letter and subsequently a picture in his
mailbox.  Although the police were unable to identify the author
of the letter, the employer placed the plaintiff on administra-
tive leave for one week, cooperated with the police investiga-
tion, apprised the plaintiff's coworkers of the situation and
required them to attend anti-harassment training, and offered to
inspect the plaintiff's truck on an ongoing basis.  Cardenas,
2002 WL 32357082, at *2-4.  The court found that these actions
were sufficient to shield the employer from liability.  2002 WL
32357082, at *7.

More similar to the facts of this case, the plaintiff in
Hirras received anonymous phone calls beginning in February 1989,
found an anonymous vulgar note on her car in April 1989, and was
the victim of anonymous graffiti threatening her job in June
1989.  Her employer, Amtrak, notified the police, interviewed
every employee about the calls, and a wire tap was placed on the
employer's phones in an effort to determine the caller.  In
addition, the plaintiff's supervisor attempted to determine
whether the note was written with an Amtrak typewriter both

19

independently and with police help, photographed the graffiti, and searched trash cans for evidence.  In considering the employer's actions, the Fifth Circuit found that the employer's response was reasonable, even though the phone calls continued for several years and the perpetrator never was identified. Hirras, 95 F.3d at 398-400.  As these cases illustrate, whether an employer's actions were reasonable is a question of fact which may nonetheless "be resolved on summary judgment where the plaintiff fails to present evidence sufficient to raise a genuine issue on the matter."  Berry, 260 F.3d at 814.

Although Reynolds does not clearly state the nature of her harassment claim, she essentially makes two arguments: (1) that NiSource is liable for the harassing letters themselves, and (2) that the way in which NiSource conducted the investigation into her complaints constituted harassment.[2]  Because she fails to establish that the letters, or NiSource's investigation into them, was based on her sex, or that NiSource's response to her complaints was unreasonable, Reynolds' harassment claim fails as a matter of law.

Beyond a conclusory statement that the letters and investigation "were certainly directed at Reynolds because of her sex," the plaintiff does not offer any evidence in support of this requirement.  See Berry, 260 F.3d at 809 (finding a conclusory allegation that harassment was gender-based inadequate to prevent

---

[2]  The plaintiff's brief is missing page 12, which contains a portion of her argument in support of her harassment claim.

20

summary judgment).  Indeed, the court can find none.  With
respect to the letters themselves, the undisputed facts show that
both Prieboy and Reynolds received letters containing the same
threats to stop seeing each other "or else" and vulgar references
to the sexual organs and preferences of both individuals.  The
letters received by NiSource Chairman Neale also cite alleged
improprieties between Prieboy and Reynolds.  Thus, the letters do
not appear to be motivated by hostility to women, but rather by
the desire to end Reynolds' relationship with Prieboy, and do not
come within the scope of Title VII.  See Huebschen, 716 F.2d at
1172.  Thus, the letters themselves are not harassment based on
sex.

     With respect to Reynolds' argument that the investigation
was harassment based on sex, Reynolds appears to be arguing that
NiSource harassed her 1) by failing to advise her of or offer
safety accommodations, 2) through Harowski's alleged comment that
Reynolds should act like a nun, not talk to or interact with men,
and stop working out at the fitness center, and 3) Kruse's
alleged accusation that Reynolds wrote the letters herself.
First, Reynolds has offered no evidence to show that NiSource's
actions with respect to offering safety options, or Kruse's
allegation that Reynolds wrote the letters, were gender-moti-
vated.  Secondly, Kruse and Harowski's statements, considered
separately or in combination, do not rise to the level of harass-
ment.  See Hilt-Dyson, 282 F.3d at 463.  In any event, the fact
that investigators may have made two inappropriate comments in

21

the course of investigating the plaintiff's claim does not make
the employer guilty of sexual harassment.  See McDonnell v.
Cisneros, 84 F.3d 256, 261 (7th Cir. 1996).

Reynolds also fails to establish employer liability.
According to Bonesteel, Skinner did not become a suspect in the
letter-writing until November 26, 2002, when he acted suspi-
ciously in the polygraph test.  No other evidence links Skinner
to the letters, and he never was arrested or brought in for
questioning by the police.  Furthermore, the only fingerprint
evidence recovered from the letters indicated that Officer Rey-
nolds authored at least one.  Setting aside the question of
whether NIPSCO's investigation was appropriate, no reasonable
jury could find that a NIPSCO employee authored the letters on
these facts.  See 42 U.S.C. §2000e-2.

NiSource's conduct in the investigation also was reasonable.
The undisputed facts show that Taber opened an investigation on
September 17, 2002, the same day Chairman Neale received the
first letter directed to NIPSCO.  By September 19, one day after
he learned Reynolds also had received a letter, Taber had col-
lected the first letters sent to Prieboy and Reynolds.  On
September 20, Reynolds notified Taber of her previous problems
with Goodwin and Skinner.  By September 24, Taber was in contact
with both the Highland and Merrillville police departments, and
Kruse began the process of looking into Reynolds' previous
complaints.  In the next month, Taber attempted to determine the
identity of the harasser through a technical review of email

22

information, studying lists of invitees to the Purdue Dinner and to a pool party at Reynolds' house, and polygraphs of three suspected employees, including Skinner.  On December 11, 2002, the police told Taber for the first time that Skinner was the primary suspect in letter writing.  Skinner, who already was laid off by NiSource and had not spoken with Reynolds since July 2002, was banned from the building within eight days.  Moreover, the letter-writing stopped at some point prior to the polygraph examinations, but NiSource officials continued to meet with the police and complete a computer search until January 2003.

Given the difficulties raised by the anonymous nature of the letters and the effort which NiSource expended in determining their authorship, NiSource's investigation was prompt and reason-ably calculated to end the harassment.  Although Reynolds may have felt that Skinner was the only suspect NiSource should be considering and would have liked to have him banned from the building sooner, the test for NiSource's liability is whether the company acted reasonably under the circumstances, not whether it acted in accordance with Reynolds' wishes.  See Cardenas, 2002 WL 32357082, at *7; Motley, 32 F.Supp.2d at 1050-51; Saxton, 10 F.3d at 526.  For these reasons, Reynolds' sexual harassment claim fails.

Turning to Reynolds' sex discrimination claim, Title VII enables a plaintiff to prove discrimination by direct evidence of discriminatory intent, or where no direct evidence exists, by using the indirect-burden shifting method established in McDon-

nell Douglas Corporation v. Green, 411 U.S. 792, 802-05, 93 S.Ct.
1817, 1824-25, 36 L.Ed.2d 668 (1973), as refined in Texas Depart-
ment of Community Affairs v. Burdine, 450 U.S. 248, 253, 101
S.Ct. 1089, 1092, 67 L.Ed.2d 207 (1981).  See Moser v. Indiana
Department of Corrections, 406 F.3d 895, 900-01 (7th Cir. 2005).
The direct method requires the plaintiff to show through either
direct or circumstantial evidence that the employer's adverse
employment action was impermissibly motivated.  Wilkins v.
Riveredge Hospital, 130 Fed. Appx. 823, 828 (7th Cir. 2005).
Here, however, Reynolds seeks to establish a prima facie case
only through the McDonnell Douglas indirect method.

The most general statement of the McDonnell Douglas method
of proof is that the plaintiff has the initial burden of showing
that: 1) she belongs to a protected group; 2) she was performing
to the employer's legitimate expectations; 3) she suffered an
adverse employment decision; and 4) the employer treated simi-
larly situated employees who are not in the protected group more
favorably.  See Moser, 406 F.3d at 900; O'Neal v. City of Chi-
cago, 392 F.3d 909, 911 (7th Cir. 2004); Williams v. Waste Man-
agement of Illinois, Inc., 361 F.3d 1021, 1029 (7th Cir. 2004).
This framework is flexible and may be adapted to fit each case.
Burdine, 450 U.S. at 253 n.6, 101 S.Ct. at 1094 n.6; Wohl v.
Spectrum Manufacturing, Inc., 94 F.3d 353, 359 (7th Cir. 1996).

Once the plaintiff has met this initial burden, "a presump-
tion of discrimination arises, and the employer must articulate a
legitimate, nondiscriminatory reason for its employment action."

24

Moser, 406 F.3d at 895; O'Neal, 392 F.3d at 911.  The defendant's burden is not one of persuasion, but rather of production and "can involve no credibility assessment."  St. Mary's Honor Center v. Hicks, 509 U.S. 502, 509, 114 S.Ct. 2742, 2748, 125 L.Ed.2d 407 (1993); Reeves, 530 U.S. at 142, 120 S.Ct. at 2106.  The burden then shifts back onto the plaintiff to show that the reason given by the defendant is just a pretext for discrimination.  Moser, 406 F.3d at 900-01.  The plaintiff cannot establish pretext merely by showing that the "reason was doubtful or mistaken."  Crim v. Board of Education of Cairo School District No. 1, 147 F.3d 535, 541 (7th Cir. 1998).  Rather, the plaintiff must show that the employer is lying or that the employer's reasoning has no basis in fact.  Guerrero v. Ashcroft, 253 F.3d 309, 313 (7th Cir. 2001); Ransom v. CSC Consulting, Inc., 217 F.3d 467, 471 (7th Cir. 2000); Crim, 147 F.3d at 541.

Despite these shifting burdens of production, the ultimate burden of persuasion remains at all times with the plaintiff.  Moser, 406 F.3d at 901l; Haywood v. Lucent Technologies, Inc., 232 F.3d 524, 531 (7th Cir. 2003); Stockett v. Muncie Indiana Transit System, 221 F.3d 997, 1001 (7th Cir. 2000).  A plaintiff alleging discrimination, however, has a lesser burden when proceeding on a summary judgment motion.  In Anderson v. Baxter Healthcare Corp., 13 F.3d 1120 (7th Cir. 1994), the Seventh Circuit stated:

> Both McDonnell Douglas and [St. Mary's Honor
> Center v. Hicks, 509 U.S. at 507, 113 S.Ct.
> at 2747] speak to the burden the plaintiff

25

> bears at trial.  However, for summary judg-
> ment purposes, the nonmoving party, in this
> case the plaintiff, has a lesser burden.  He
> must only "produce evidence from which a
> rational fact-finder could infer that the
> company lied" about its proffered reasons for
> dismissal.
>
> 13 F.3d at 1124 (quoting Shager v. Upjohn,
> 913 F.2d 398, 401 (7th Cir. 1994))

See also Plair, 105 F.3d at 349; Cliff v. Board of School Commis-
sioners of the City of Indianapolis, Indiana, 42 F.3d 403, 412
(7th Cir. 1994).  If the plaintiff is unable to meet her burden,
her claims must fail.

Although Reynolds states that the adverse employment action
she experienced was either "the very facts comprising the intol-
erable hostile environment which the Company created or allowed"
or alternatively, constructive demotion, the court finds that
these arguments are essentially the same: that the totality of
NiSource's actions gave rise to Reynolds' constructive demotion.
(See Mem. Opp. MSJ, p. 15)

The Seventh Circuit broadly defines the phrase "adverse
employment action" to mean "one that is materially adverse,
meaning more than a mere inconvenience or an alteration of job
responsibilities."  Hilt-Dyson, 282 F.3d at 465 (quotation and
citation omitted).  Under this definition, the court recognizes
three categories of materially adverse employment actions:

> (1) cases in which the employer's compensa-
> tion, fringe benefits, or other financial
> terms of employment are diminished, including
> termination; (2) cases in which a nominally
> lateral transfer with no change in financial
> terms significantly reduces the employee's

career prospects by preventing her from using
her skills and experience, so that the skills
are likely to atrophy and her career is like-
ly to be stunted; and (3) cases in which the
employee is not moved to a different job or
the skill requirements of her present job
altered, but the conditions in which she
works are changed in a way that subjects her
to a humiliating, degrading, unsafe,
unhealthful, or otherwise significantly nega-
tive alteration in her workplace environment.

O'Neal, 392 F.3d at 911

See also Herrnreiter v. Chicago Housing Authority, 315 F.3d 742,
744-45 (7th Cir. 2002), cert. denied, 540 U.S. 984, 124 S.Ct.
472, 157 L.Ed.2d 375 (2003).

The third category encompasses constructive demotion which
is evaluated under the same analysis as constructive discharge
and cases of harassment defined as "mistreatment of an employee
by coworkers or supervisors that is sufficiently severe to worsen
substantially his conditions of employment as they would be
perceived by a reasonable person in the position of the em-
ployee." Herrnreiter, 315 F.3d at 745; Simpson v. Borg-Warner
Automotive, Inc., 196 F.3d 873, 876 (7th Cir. 1999). Construc-
tive discharge is only a tangible employment action when caused
by the official acts of an employee's supervisors. See Robinson
v. Sappington, 351 F.3d 317, 335-36 (7th Cir. 2003), cert. de-
nied, ___ U.S. ___, 124 S.Ct. 2909, 159 L.Ed.2d 813 (2004).
Furthermore, medical leave taken voluntarily in response to an
employer's action does not constitute an adverse employment
action. See Mangano v. Sheahan, No. 00 C 3953, 2002 WL 1821738,
at *7 ("We reject Plaintiff's attempt to create an adverse

employment action out of the consequence of an action not itself an adverse employment action.").

With respect to the employer's actions in the constructive demotion/constructive discharge context, the plaintiff must show first that her "working conditions were so intolerable that a reasonable person would have been compelled to resign" and second, that the conditions were intolerable "because of the unlawful discrimination."  Simpson, 196 F.3d at 877 (internal citation and quotation omitted); Cooper-Schut v. Visteon Automotive Systems, No. IP-01-0899-C-B/G, 2003 WL 1702261, at *11 (S.D. Ind. Mar. 31, 2003), aff'd 361 F.3d 421 (7th Cir. 2004); Lindeman v. Village of Oak Brook, No. 00 C 818, 2002 WL 1822923, at *20 (N.D. Ill. Aug. 8, 2002).  Although "[c]onstructive demotion may not call for as severely intolerable working conditions as constructive discharge," it nevertheless requires conditions more severe than those actionable under a hostile work environment claim.  Simpson, 196 F.3d at 977 (comparing cases in which the court "found a range of unpleasant and even embarrassing employer actions tolerable and therefore insufficient to effect a constructive discharge").  See also Robinson, 351 F.3d at 336. Thus, if an employer's actions are not "severe enough to constitute sexual harassment," then they are not severe enough to constitute sex discrimination under the constructive demotion/-discharge analysis.  See Hilt-Dyson, 282 F.3d at 466.

Reynolds' sex discrimination claim fails because this court already has determined that NiSource's actions towards her did

28

not rise to the level of sexual harassment.  Moreover, as already discussed in great length, she has not established that NiSource's actions were motivated by gender animus.  Consequently, she cannot meet either requirement of constructive demotion.  Moreover, setting aside the employer's actions to focus on the "demotion" aspect of constructive demotion, the undisputed facts show that Reynolds voluntarily took medical leave which is not attributable to her employer.  See Mangano, 2002 WL 1821738, at *7.  The Seventh Circuit has made clear that "[w]hile adverse employment actions extends beyond readily quantifiable losses, not everything that makes an employee unhappy is an actionable adverse action."  O'Neal, 392 F.3d at 911 (quoting Conley v. Village of Bedford Park, 215 F.3d 703, 712 (7th Cir. 2000)).  While Reynolds may have been uncomfortable with the remarks allegedly made by Kruse and Harowski, they did not create the kind of intolerable environment the Seventh Circuit has found to constitute constructive demotion.  See Herrnreiter, 315 F.3d at 745; Simpson, 196 F.3d at 876.

Because Reynolds has failed to establish adverse employment action, the court need not reach the plaintiff's failure to show unequal treatment between herself and other employees similarly situated.

_____

For the foregoing reasons, the Motion for Summary Judgment filed by the defendants, NiSource, Inc. and NiSource Corporate Services, Co., on February 28, 2005 is GRANTED.

ENTERED this 8th day of September, 2005


                              s/ ANDREW P. RODOVICH
                                 United States Magistrate Judge